TODD KIM
Assistant Attorney General
CODY MCBRIDE
Trial Attorney, CA Bar No. 298099
cody.mcbide@usdoj.gov
United States Department of Justice
Environment & Natural Resources Division
Indian Resources Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
TEL:  (202) 305-0269
FAX: (202) 353-1156
Attorneys for Plaintiff

### IN THE UNITED STATES DISTRICT COURT FOR
### THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| CRAIG FERGUSON | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

---

## **COMPLAINT**

The United States of America, by authority of the Attorney General of the United States and at the request of the United States Department of the Interior, acting on its own behalf and as trustee for the Colorado River Indian Tribes ("Tribes" or "CRIT"), files this complaint and alleges as follows:

1

## NATURE OF ACTION

1.     This is a civil action brought pursuant to the federal common law of trespass and ejectment to remedy Craig Ferguson's ("Ferguson" or "Defendant") intentional and unauthorized occupancy and use of lands that the United States owns in trust for the benefit of the Tribes and that are subject to federal authority, supervision, and restrictions against alienation.

2.     Defendant has repeatedly been notified regarding this trespass and has been ordered to cease and desist from it. Defendant continues to occupy and use the subject trust lands, even after such notifications and orders. Defendant has also unlawfully deprived the Tribes of their right to occupy and use that land.

3.     The United States seeks all just and proper remedies against Defendant, including, but not limited to, the following: declaratory relief; damages or mesne profits for the unlawful occupancy and use of the property, and for restoration and remediation of the damaged and degraded property; ejectment; and all costs and fees associated with this action.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of and parties to this action pursuant to 28 U.S.C. §§ 1331, 1345.

5.      Venue properly lies in this District, pursuant to 28 U.S.C. § 1391(b), because the subject property, described in paragraph 7 below, is in the District and all of the alleged acts occurred in the District.

## PARTIES

6.      Plaintiff is the United States of America suing on its own behalf and in its capacity as trustee for the Tribes.

7.      Defendant has unlawfully occupied and continues to occupy unlawfully Lot 17 of the McCoy Subdivision ("McCoy Lot 17"), comprising an area of approximately 0.21 acres, with 60 feet of river frontage. McCoy Lot 17 is located within Section 11, Township 4 South, Range 23 East, of the San Bernardino Base and Meridian, a short distance north of Blythe, Riverside County, California ("Subject Property").

## GENERAL ALLEGATIONS

**A.    The Lands at Issue**

8.      CRIT is a federally recognized Indian tribe residing on the Colorado River Indian Reservation ("Reservation"), which Congress established in 1865. Act of March 3, 1865, 13 Stat. 541, 559. The Reservation straddles the Colorado River ("River")—which serves as the Arizona-California border—with land in both Arizona and California. Originally, the entire Reservation was located to the

east, or Arizona side, of the River. The Reservation was subsequently expanded

by Executive Orders dated November 22, 1873; November 16, 1874; May 15,

1876; and November 22, 1915.

9.      In 1964, Congress affirmed the CRIT Reservation as established and

expanded by Executive Order, providing that "unallotted lands of the . . .

Reservation . . . are . . . tribal property held in trust by the United States for the

use and benefit of [CRIT]." Pub. L. 88-302, 78 Stat. 188, 189 (April 30, 1964)

("1964 Act"). The 1964 Act authorized the Secretary to approve leases of lands

on the Reservation, but it initially held in abeyance the Secretary's leasing

authority on lands on the California side of the River until such time that those

lands were "determined to be within the reservation."  Pub. L 88-302, Sec. 5.

10.     On January 17, 1969, the Interior Solicitor Edward Weinberg issued

a legal opinion in which he determined that the western boundary of the

Reservation included a portion of Riverside County, California.  Edward

Weinberg, U.S. Dep't of the Interior, Opinion Letter on Western Boundary of the

Colorado River Indian Reservation (Jan. 17, 1969), *as reprinted in* Opinions of

the Solicitor of the Department of the Interior Relating to Indian Affairs 1917-

1974 at Vol. II 2096, https://thorpe.law.ou.edu/sol_opinions/p2076-2100.htm.

The Secretary of the Interior, Stewart Udall, concurred in the opinion and

instructed the Director of the Bureau of Land Management ("BLM") to suspend certain surveys and reinstate others to serve as the line of the western boundary of the Reservation. Exhibit 1, Memorandum from the Secretary of the Interior to BLM Director (January 17, 1969).

11. In 1970, the Secretary of the Interior, Walter Hickel, confirmed Secretary Udall's "final, official and unqualified declaration that the 'Benson Line' was the proper location of the western boundary of the Reservation." Exhibit 2, Letter from the Secretary of the Interior to CRIT Chairman (June 2, 1970).

12. The Bureau of Indian Affairs ("BIA") then published a notice in the Federal Register that extended the Colorado River Reservation Indian leasing program to "those lands which the Secretary of the Interior has determined, pursuant to the Act of April 30, 1964 (78 Stat. 188), to be within the Colorado River Reservation." Certain California Lands Determined to Be Within the Colorado River Reservation, 35 Fed. Reg. 18,051 (Nov. 25, 1970).

13. The Subject Property, identified administratively by the BIA as Lot 17 of the McCoy Subdivision, is situated in a portion of the San Bernardino Base and Meridian, Township 4 South, Range 23 East, Section 11, a short distance north of Blythe, Riverside County, California. The Subject Property is within the

exterior boundaries of the lands determined to be within the Colorado River Indian Reservation as noticed in the Federal Register on November 25, 1970.

> **B.**     **Defendant's Unauthorized Occupation and Use of the Subject Property**

14.     After the November 25, 1970, Federal Register notice, the BIA began approving permits to occupy the Reservation lands located west of the Colorado River, including the permit for the Subject Property.

15.     CRIT utilized standard-form permits that were approved by the *Resources Development Committee* (RDC), a subcommittee of CRIT's Tribal Council. Each permit was captioned with "Permit No. WB-[XXX](R) Western Boundary Permit," with "Permit (Homesite)" written below.

16.     The Articles included therein identify the parties, describe the premises, state the terms of the permit, and list the rental amounts to be paid. The permits identify CRIT as the permitter and includes signature lines for the Permittee, the Tribal Chair, Tribal Secretary, and the BIA Superintendent.

17.     Once a permit was executed, it was delivered to BIA's Land, Titles, and Records Office for recordation. A recorded permit contained a nine-digit record number beginning with 603. That number was stamped in black ink and placed in the lower righthand corner of each page. Once the BIA received a

permit, it stamped the first and last page with ink, noting the permit was received and identifying the date, time, and location of the receiving BIA office.

18.     On September 21, 1979, CRIT issued Permit No. WB-199(R) to Thomas Shea. Exhibit 3, Permit No. WB-199(R) ("Permit"). The Permit was approved by the BIA Superintendent of the Colorado River Agency ("Superintendent") on December 4, 1979. *Id.* at 13.

19.     Article 2 of the Permit states that the Subject Property is "within the Colorado River Indian Reservation." *Id.* at 1-2.

20.     Article 3 of the Permit states that "[t]he purpose of this permit shall be for the use and occupancy by the Permittee named herein and his immediate family only, for single family residential occupancy." *Id.* at 2.

21.     Article 4 of the Permit states that it "may be terminated at the end of the initial [one year] term or at the end of any such successive one year period by written notice served by the Secretary or the Permittee at least ninety (90) days in advance thereof." *Id.*

22.     Article 5 of the Permit states that "[t]he Permittee . . . covenants and agrees to pay in advance, to the BUREUA OF INDIAN AFFAIRS for the use and benefit of Permitter, rental, in the amount herein set out . . . or as may be adjusted from time to time." *Id.* at 2-3. Article 5 of the Permit also provides that, "if any

1   installment of rental is not paid on or before the due date, interest at the rate of

2   12% per annum shall become due and payable and will run until said rental or

3   payment is paid." *Id.* at 3. At the time of signing, annual rent for the Subject

4   Property was $270.00. *Id.*

5       23.    Article 6 of the Permit prohibits the Permittee from placing

6   "permanent improvements" on the Subject Property without first obtaining

7   written consent from CRIT and requires the Permittee to remove personal

8   property "not later than thirty (30) days from the date of expiration of this permit

9   or any extension(s) thereof." *Id.* at 3-4.

10       24.    Article 15 of the Permit states that "Permittee understands and agrees

11   that this permit shall not be deemed to confer upon Permittee any equity right,

12   title or interest to or in the permitted lands, and further, Permittee hereby

13   relinquishes all past, present or future claims of right, title or interest in, the lands

14   held under this permit or any other lands within the Colorado River Indian

15   Reservation . . . ." *Id.* at 9.

16       25.    Article 18 of the Permit states that:

    should Permittee default in the payment of any installment or rent or

    any other sum when due . . . the Secretary . . . may declare this permit

    forfeited by giving Permittee written notice thereof, and upon such

8

forfeiture, Permittee shall have no further rights or interest hereunder

or in or to the permitted premises or any part thereof, and Permitter

may re-enter and take possession of the permitted premises and all

buildings and improvements thereon, and may cast from Permittee

and all persons claiming under the permit from the premises.

*Id.* at 10.

26.     Article 22 of the Permit states that "[h]olding over by the Permittee after the termination of this permit shall not constitute a renewal or extension hereof or give the Permittee any rights hereunder or in or to the Permitted premises." *Id.* at 11.

27.     Article 25 of the Permit states that the Permit "and the covenants, conditions, and restrictions hereof shall extend to and be binding upon the successors, heirs, assigns, executors, and administrators of the parties hereto." *Id.* at 12.

28.     Article 27 of the Permit states that "[s]ubletting or assignment of this permit may be made only with the written consent of all the parties hereto." *Id.*

29.     The annual rent for the Subject Property increased from $270.00 to $720.00 in January of 1983. Exhibit 4, Payment Record.

9

30.     The annual rent for the Subject Property increased from $720.00 to $1,200.00 in January 1986. Exhibit 4, Payment Record.

31.     On May 29, 1986, Shea assigned the Permit to Defendant. Exhibit 5, Assignment to Ferguson. Defendant agreed to "fulfill all obligations, conditions, and stipulations contained in" the Permit. *Id.* CRIT agreed to the assignment as the "Lessor." *Id.* at 2. And the Superintendent approved the assignment on June 10, 1986. *Id.*

32.     On July 18, 1988, the Superintendent sent a letter to Defendant informing him that he was in violation of the terms and conditions of the Permit for failure to pay rent for 1988. Exhibit 6, Letter from Superintendent to Ferguson (July 18, 1988). The Superintendent enclosed a bill in the amount of $1,200.00 for rent, plus $83.24 in interest. *Id.*

33.     Defendant subsequently paid the full amount of rent owed for 1988. Exhibit 4, Payment Record.

34.     On February 10, 1989, the Superintendent sent a letter to Defendant informing him that BIA had not received his rent payment of $1,200.00 for 1989. Exhibit 7, Letter from Superintendent to Ferguson (Feb. 10, 1989).

35.     Defendant subsequently paid the full amount of rent owed for 1989, 1990, and 1991. Exhibit 4, Payment Record.

36.     On October 23, 1991, CRIT sent a letter to Defendant informing him that rental rates would increase for all Western Boundary lots effective January 1, 1992. Exhibit 8, Letter from CRIT to Ferguson (Oct. 23, 1991). The rental rate increased from $20 to $45 per riverfront foot for river frontage lots. *Id.* This increase resulted in an annual rent of $2,700.00 for the Subject Property. The letter stated that Defendant would "receive a bill for the rental in the above set out amount in the near future" and that "[u]pon receipt of the rental payment your permit will be automatically renewed." *Id.*

37.     Defendant subsequently paid the full amount of rent owed for 1993. Exhibit 4, Payment Record.

38.     On December 15, 1995, CRIT sent Defendant a letter notifying him that he was in violation of Article 5 of the Permit for failure to pay the full amount of annual rent for 1994 and 1995. Exhibit 9, Letter from CRIT to Ferguson (Dec. 15, 1995). The letter stated that Defendant owed a balance of $3,900.00. *Id.* at 1. The letter also instructed Defendant that he had ten (10) days to show cause why the Permit should not be cancelled and that, if he failed to show cause, CRIT would proceed with remedies pursuant to Article 18, including immediate cancellation. *Id.*

39.     On February 12, 1996, Defendant paid CRIT $3,000.00 in rent for the Subject Property. Exhibit 10, Cash Receipt from Ferguson to CRIT (Feb. 12, 1996).

40.     On August 9, 1996, the BIA Phoenix Area Director provided notice to Defendant that the Permit was "declared forfeited and [was] terminated effective immediately," in accordance with Article 18 of the Permit, for failure to pay the full amount of rent owed for 1995 and 1996. Exhibit 11, Letter from BIA Phoenix Area Director to Ferguson (Aug. 9, 1996). The Area Director notified Defendant that he owed $3,600.00 in back rent plus interest at twelve percent per annum. *Id.* Consistent with the Permit, the Area Director ordered the removal of personal property from the Subject Property within 30 days from receipt of the letter, but no later than September 12, 1996. *Id.* Lastly, the Area Director informed Defendant that the decision would become final 30 days from receipt of the letter, unless an appeal was filed with the Interior Board of Indian Appeals ("IBIA"). *Id.* at 2.

41.     Defendant did not pay back rent or remove his personal property from the Subject Property as demanded in the Area Director's August 9, 1996, letter. Instead, Defendant continued to occupy and use the Subject Property without authorization or permission.

1    42.    On July 1, 2010, CRIT posted a notice on the Subject Property

2    informing the occupant that he was in trespass because Defendant's Permit was

3    terminated on August 9, 1996. Exhibit 12, Notice (July 1, 2010). CRIT demanded

4    that the occupant vacate the property on or before August 6, 2010; otherwise,

5    CRIT would "take legal action to remove you from the property, [and] obtain a

6    monetary judgment resulting from your continued trespass . . . ." *Id.*

7    43.    On August 1, 2012, CRIT Lease Specialist, Andrea Vernoy, sent a

8    letter to Defendant informing him that to occupy the Subject Property lawfully he

9    would need to enter into a new lease and pay the back rent owed to CRIT. Exhibit

10   13, Letter from Vernoy to Ferguson (August 1, 2012). If Defendant agreed to pay

11   $3,300 for 2011 rent, $3,300 for 2012 rent, $1,650 as a security deposit, and all

12   back rent, either in a lump sum or in payments over 10 years, CRIT would waive

13   the default interest owed. *Id.* at 1-2. Vernoy also informed Defendant that he had

14   the option to "walk away" if he turned over all improvements on the Subject

15   Property to CRIT. *Id.* at 2. Under this option, CRIT would forgive all past due

16   rent and interest Defendant owed. *Id.*

17   44.    Defendant neither entered into a new lease and paid back rent nor

18   chose the "walk away" option. Instead, Defendant continued to occupy and use

19   the Subject Property without authorization or permission.

45.     On April 9, 2013, the CRIT Attorney General, Rebecca Loudbear, sent a letter to trespassers, including Defendant, explaining a tribal court decision regarding CRIT's eviction of Roger French from the Rymer Subdivision on the Reservation. Exhibit 14, Letter from Loudbear to Trespassers (Apr. 9, 2013). The letter also informed trespassers that CRIT was still offering solutions to resolve ongoing trespasses, but that solutions would not be available for long. *Id.* at 2. The letter stated that CRIT would continue to pursue all available legal remedies against trespassers on the Reservation. *Id.*

46.     The West Bank Homeowner's Association ("WBHOA"), on behalf of 29 individual trespassers, appealed to the Interior Board of Indian Appeals ("IBIA") the BIA's May 31, 2016, decisions demanding that each individual stop trespassing. *See* Exhibit 15, *West Bank Homeowners Ass'n v. Acting Reg'l Dir., Bureau of Indian Affs.*, 64 IBIA 82, 2017 WL 1192190 (IBIA Mar. 24, 2017). The IBIA received notice of the appeal on September 12, 2016, nearly two months after the filing deadline of June 30, 2016. *Id.* at 1. On March 24, 2017, the IBIA dismissed WBHOA's appeal as untimely. *Id.* Defendant received notice of the IBIA's decision. *Id.* at 5.

47.     On information and belief, tribal officials have periodically observed and inspected the Subject Property and noted each time that Defendant continues to illegally occupy the premises.

48.     Defendant's unlawful use and occupation of the Subject Property has been and continues to be knowing, intentional, willful, and contrary to federal law, and it has deprived the Tribes and Plaintiff of the occupancy and use they are entitled to on said property.

**C.     Legal Basis for Claims against Defendant**

49.     The federal common law of trespass "generally comports with the Restatement of Torts," *United States v. Milner*, 583 F.3d 1174, 1182 (9th Cir. 2009), under which trespass is defined as "the intentional use of the property of another without authorization and without privilege," *United States v. Imperial Irr. Dist.*, 799 F. Supp. 1052, 1059 (S.D. Cal. 1992). Further, "[t]he intent required is simply an intent to be on the land." *Id*.

50.     Under federal common law, remedies for trespass include declaratory relief, damages, and ejectment. *See United States v. Pend Oreille Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1549 n.8 (9th Cir. 1994); *United States v. Torlaw Realty, Inc.*, 483 F. Supp. 2d 967, 973 (C.D. Cal. 2007), *aff'd*, 348 Fed. Appx. 213 (9th Cir. 2009). As stated by the United States Supreme Court, "that an action

1   of ejectment could be maintained on an Indian right to occupancy and use, is not

2   open to question." *Marsh v. Brooks*, 49 U.S. 223, 232 (1850).

3       51.     Moreover, residential leases on Indian land are governed, generally,

4   by 25 C.F.R. Part 162. The Permit is a residential lease and is thus governed by

5   these regulations.

6       52.     The BIA's leasing regulations define a trespass as "any unauthorized

7   occupancy, use of, or action on any Indian land or Government land."  25 C.F.R.

8   § 162.003.

9       53.     Defendant is required to have a lease to occupy and use such

10  properties on the Reservation. 25 C.F.R. § 162.005.

11      54.     When a lessee remains in possession after a residential lease is

12  terminated, the BIA may treat the unauthorized possession as a trespass and take

13  action to recover possession and pursue any additional remedies under applicable

14  law. 25 C.F.R. § 162.371.

15      55.     Defendant currently has no ownership interest in the Subject

16  Property. And although Defendant recognized the Subject Property's trust status

17  by leasing it from CRIT and paying rent accordingly, he does not now possess a

18  valid lease or permit for the Subject Property. Therefore, Defendant's occupancy

16

and use of the Subject Property constitutes trespass under federal common law and governing regulations.

## **FIRST CAUSE OF ACTION**

### **(Trespass)**

56.     The United States realleges each of the preceding paragraphs as if fully set forth herein.

57.     Since at least August 9, 1996, Defendant has willfully occupied and used the Subject Property without authorization or legal right. Despite being notified of the termination of the Permit by letter dated August 9, 1996, and again by multiple notices and letters, and being offered the opportunity to enter into a new lease with CRIT or "walk away," Defendant has not vacated the Subject Property.

58.     As a result of Defendant's unauthorized and unlawful occupation and use of the Subject Property, he has committed and is now committing a continuing willful trespass on CRIT land that is subject to federal supervision, authority, and restrictions against alienation.

59.     As a direct and proximate result of Defendant's continuing and willful trespass, he has damaged and continues to damage the Tribes' trust

property and the governmental interests of the United States, and he will continue to do so unless and until the trespass is remedied.

## SECOND CAUSE OF ACTION

### (Ejectment)

60.     The United States realleges each of the preceding paragraphs as if fully set forth herein.

61.     Since at least August 9, 1996, Defendant has willfully occupied and used the Subject Property without authorization or legal right. Despite being notified of the termination of the Permit by letter dated August 9, 1996, and again by multiple notices and letters, and being offered the opportunity to enter into a new lease with CRIT or "walk away," Defendant has not vacated the Subject Property.

62.     As a result of Defendant's unauthorized and unlawful occupation and use of the Subject Property, he has unlawfully prevented and continues to prevent CRIT from occupying and using its land, which is subject to federal supervision, authority, and restrictions against alienation.

63.     Defendant has defied and continues to defy the authority of the United States, acting through the BIA, to administer the Subject Property. Defendant has refused to comply with the BIA's requests that he cease and desist

1  from his occupation and use of the Subject Property and remove all facilities and

2  equipment from the Subject Property.

3       64.    Defendant's continuing occupation and use of the Subject Property is

4  unlawful and, as a direct and proximate result of that trespass, he has damaged

5  and continues to damage the Tribe's and United States' property interests, and he

6  will continue to do so unless and until he vacates the Subject Property or is

7  ejected, and his facilities and equipment are removed from the Subject Property.

8  **PRAYER FOR RELIEF**

9  WHEREFORE, Plaintiff, the United States of America, respectfully requests that

10  the Court provide the following relief:

11      a.    Declare pursuant 28 U.S.C. §§ 2201, 2202 that Defendant's willful,

12  unauthorized, and continuing occupation and use of the Subject Property, without

13  the authorization of the Tribes and United States, constitutes a continuing trespass;

14      b.    Enter a judgment for mesne profits or monetary damages caused by

15  Defendant's willful, unauthorized, and continuing occupancy, use, and disturbance

16  of the Subject Property accruing over the six years and 90 days from the date of

17  filing, including, without limitation, the fair rental value of the property,

18  administrative costs, and the costs and expenses of restoring and remediating the

19  damaged and degraded property;

1    c.    Enter a judgment for pre- and post-judgment interest on all damages

2  awarded from the date of filing of this Complaint until the Judgment is paid in full;

3    d.    Eject Defendant from the Subject Property;

4    e.    Order Defendant to remove from the Subject Property any and all

5  equipment, personal property, buildings, and other materials placed thereon by

6  him, and abate any damage caused to the Subject Property necessary to restore the

7  property to its natural condition, or, in the alternative, authorize the United States

8  to undertake these tasks, with all costs and expenses incurred by the United States

9  to be paid by Defendant;

10    f.    Award the United States all costs of suit to the maximum extent

11  permissible; and

12    g.    Grant such other and further relief as the Court deems just and proper.

DATED:  November 6, 2023

Respectfully submitted,

TODD KIM
Assistant Attorney General

/s/ Cody McBride
CODY MCBRIDE
Trial Attorney, CA Bar No. 298099
cody.mcbride@usdoj.gov

United States Department of Justice

Environment & Natural Resources Division
Indian Resources Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
TEL:  (202) 305-0262
FAX: (202) 353-1156

OF COUNSEL

Michael Bianco
Shani N. Sumter
Karen F. Boyd
Victoria A. Cejas
United States Department of the Interior
Office of the Solicitor
Indian Trust Litigation Office